# FRIER LEVITT
ATTORNEYS AT LAW

Jonathan E. Levitt, Esq. (Bar No. 65680)
Todd Mizeski, Esq. (Bar No. 25122001N)
Lucas W. Morgan, Esq. (Bar No. 120222014N)
84 Bloomfield Avenue
Pine Brook, NJ 07058
Telephone: (973) 618-1660
Facsimile: (973) 618-0650

Attorneys for the Plaintiff, Life Star Pharmacy, Inc. d/b/a Life Star Pharmacy

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| LIFE STAR PHARMACY, INC. D/B/A LIFE STAR PHARMACY,<br><br>      Plaintiff,<br><br>vs.<br><br>EXPRESS SCRIPTS, INC.,<br><br>      Defendant. | Case No.<br><br>**COMPLAINT AND JURY DEMAND**<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT AND JURY DEMAND**

Plaintiff, Life Star Pharmacy, Inc. d/b/a Life Star Pharmacy ("Life Star" or "Plaintiff"), by and through its attorneys, Frier Levitt, LLC, by way of Complaint against Defendant, Express Scripts, Inc. ("Defendant" or "Express Scripts") (collectively the "Parties"), hereby alleges the following:

**PRELIMINARY STATEMENT**

1. This matter arises out of a dispute between a duly licensed New York pharmacy, Life Star Pharmacy, and Express Scripts, a pharmacy benefit manager ("PBM"), whereby Express Scripts has improperly, and in violation of the Parties' contract, terminated Life Star from its

1

pharmacy networks based on erroneous allegations that Life Star failed to collect less than $30.00 in copayments from patients.

2. By way of further detail, rather than accept documentation, including receipts and patient attestations that conclusively resolved the allegations made by Express Scripts in favor of Life Star, Express Scripts has rejected or otherwise ignored those documents and opted to terminate Life Star without a justifiable basis under the Parties' contract and applicable law. Accordingly, Plaintiff seeks relief from Express Scripts' improper conduct and improper termination.

## THE PARTIES

3. Plaintiff, Life Star Pharmacy, Inc. d/b/a Life Star Pharmacy, is a New York based corporation which operates as a duly licensed independent pharmacy almost exclusively in New York. Life Star's principal place of business located at 1215 Jerome Avenue, Bronx, NY 10452.

4. Defendant, Express Scripts, Inc., is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in the State of Missouri located at 1 Express Way, St. Louis, MO 63121.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship. Plaintiff is a citizen of the State of New York with its principal place of business in New York while Defendant is a corporation existing under the laws of the State of Delaware with its principal place of business in the State of Missouri. The nature of this dispute as well as the issues involved include an amount in controversy in excess of $75,000.00 exclusive of interest and costs.

6. Venue in this Court is also proper under the contractual agreement entered into by

and between Express Scripts and Life Star. Specifically, the Provider Manual's "Dispute Resolution" provision which is incorporated by reference into the Provider Agreement and one of the governing contract documents, states: "[a]ll litigation between the parties arising out of or related in any way to the interpretation or performance of the Provider Agreement shall be litigated in the U.S. District Court for the Eastern District of Missouri[.]"

7. In addition to Missouri law based on the Parties' contract, Express Scripts is also subject to various other laws including New York State laws and regulations that govern the provision of pharmacy benefit management services based on their business activities and contracts with New York pharmacies as well as applicable federal law.

## FACTS AND INFORMATION COMMON TO ALL COUNTS

### I.   Summary and Relevant Background

8. As mentioned, Life Star is located in the Bronx, New York and serves almost exclusively New York residents and patients. Life Star operates as a full-service community based, independent pharmacy. Among the various services and capabilities Life Star possesses, Life Star is a participating pharmacy in the Federal 340B Prescription Drug Program, a program which helps ensure that low-income individuals can obtain necessary medication at affordable prices, and in some cases, at no cost. For example, Life Star, as 340B Contract Pharmacy, participates in the Federal 340B Prescription Drug Program pursuant to a contract with Morris Heights Health Center, a local health center serving the surrounding community which operates as a Covered Entity as it relates to the 340B Program.

9. In addition, participating in the 340B Program, Life Star also takes active steps to ensure that their patients receive high quality care. For example, Life Star works closely with its patients and its patients' prescribing physicians to ensure that patients receive their prescription

medications in a prompt, accurate, and safe manner. If issues arise in obtaining the medication, for example due to coverage issues, Life Star and its qualified pharmacy personnel will assist the patient in obtaining the prescribed medication or finding suitable alternatives approved by the prescribing physician(s).

10. Life Star also functions as a cornerstone of the small Spanish-speaking neighborhood in which it is located, often going above and beyond providing services related to prescription medications that it dispenses. Due to pronounced issues in the Spanish-speaking community with medication adherence, often caused by language barriers, Life Star employs several multi-lingual employees that are fully fluent in Spanish to ensure that Spanish-speaking patients get their medications promptly and also have a complete understanding of their prescribed medications and how to take them. While this is something that is often overlooked, language barriers are one of the leading causes of medication non-adherence.

**II.  Background of Express Scripts and the PBM Industry**

11. Express Scripts is a PBM. As a PBM, Express Scripts processes prescription medication claims under patients' health insurance for different third parties including insurance plan sponsors, which include commercial insurance plans, Medicare plans, and Medicaid plans. Express Scripts essentially serves as an intermediary between plan sponsors and pharmacy providers like Life Star.

12. Express Scripts is one of the three largest PBMs in the country. Express Scripts has gained this substantial leverage and market share through several strategies, many of which are anti-competitive in nature and have distinct characteristics including significant consolidation and pronounced vertical integration. Over the past several years, the PBM industry has undergone

drastic changes. Nearly 80% of the PBM marketplace is comprised of only three PBMs: (1) CVS Caremark – 33%; (2) Express Scripts – 26%; and (3) OptumRx – 21%.[1]

13. This market share analysis includes the collaborative efforts undertaken in April 2020 between Express Scripts and another large PBM, Prime Therapeutics. These collaborative efforts resulted in Express Scripts taking over Prime's PBM services and contracting for an estimated 40% of Prime's retail network, contributing to the expansion of Express Scripts footprint in the PBM industry.[2]

14. Currently, Express Scripts, as one of the largest six PBMs in the country is being investigated by the Federal Trade Commission ("FTC") because of numerous concerns, including arbitrary, improper exclusion of providers from its pharmacy provider networks, a concerning anti-competitive practice.

15. Specifically, less than one year ago, on June 7, 2022, the FTC announced that it was launching an investigation into the six largest PBMs' impact on the access and affordability of prescription drugs. Express Scripts, as one of these six PBMs, received a compulsory order from the FTC to provide information and records regarding its business practices. FTC Chair Lina M. Kahn stated, "[t]his study will shine a light on these companies' practices and their impact on pharmacies, payers, doctors, and patients." The FTC made specific note that the six largest PBMs are vertically integrated with the largest insurance companies and wholly owned mail order and specialty pharmacies, giving them enormous influence on which pharmacies patients can use and the ability to direct patients away from competitor pharmacies to wholly owned affiliates.

---

[1] Drug Channels, The Top Pharmacy Benefit Managers of 2021: The Big Get Even Bigger (rerun), July 25, 2022, https://www.drugchannels.net/2022/07/the-top-pharmacy-benefit-managers-of.html (Accessed August 30, 2022).
[2] Id.

16. In announcing its investigation, the FTC noted that it intended to shed light on PBMs, including Express Scripts, and the practice of "steering" patients toward PBM-owned and affiliated pharmacies. The FTC also noted that as PBMs have steered patients to PBM-owned and affiliated pharmacies, from 2003 to 2018, over 1,230 independent, rural pharmacies have closed their doors[3] and in that same time, 630 rural ZIP codes lost their only pharmacy provider.[4]

17. For an independent provider like Life Star to provide services to a patient that has their pharmacy benefits administered by Express Scripts, the provider must contract with Express Scripts. Due to the market power and leverage Express Scripts yields, Express Scripts unilaterally dictates the terms of pharmacy participation through several contract documents including Provider Agreements, a Network Provider Manual, and numerous provider communications and Network Updates most of which are unilaterally imposed as "addenda" to the contract. Indeed, Express Scripts has complete control over the contracting process including the terms of participation and the way a participating pharmacy carries out its performance, including the pharmacy's reimbursement rates.

18. In addition to the size of its PBM business, Express Scripts has expanded its business model far past its original role as a PBM serving as an intermediary between plan sponsors and pharmacies. In 2012, Express Scripts acquired Medco Health Solutions, Inc. as well as Accredo, a now wholly owned specialty pharmacy that operates in direct competition with many of the providers that Express Scripts oversees as a PBM. With this acquisition, Express Scripts strategically positioned itself as both the administrator and "watchdog" of its network pharmacies, as well as a direct competitor of the network pharmacies (its competition), including Life Star.

---

[3] Abiodun Salako, Fred Ullrich, Keith Mueller, Update: Independently Owned Pharmacy Closures in Rural America, 2003-2018, at 1 (July 2018), RUPRI Center for Rural Health Policy Analysis, University of Iowa College of Public Health, https://rupri.public-health.uiowa.edu/publications/policybriefs/2018/2018%20Pharmacy%20Closures.pdf.
[4] Id. at 5.

19. Since Express Scripts' acquisition, Accredo has become the nation's second largest specialty pharmacy provider with an annual estimated prescription revenue of $43.5 billion, capturing approximately 23% of the prescription revenue from specialty drugs nationally.[5] In addition to the specialty pharmacy operations, Express Scripts also operates a large mail order pharmacy which also serves as an additional competitor of pharmacies like Life Star.

20. More recently, in December 2018, Express Scripts was purchased by one of the nation's largest health insurance companies: Cigna, Inc. This purchase increased Express Scripts' influence and vertical integration in the pharmacy marketplace. This became especially pronounced when Cigna moved its PBM relationship from OptumRx to Express Scripts.

21. As detailed below, Express Scripts has utilized its power as a PBM to the detriment of independent pharmacies and providers in the marketplace through, for example, the unreasonable exclusion and/or termination of pharmacies that are willing to meet the terms and conditions of its contract.

### III. The Contractual Relationship Between Express Scripts and Life Star

22. Express Scripts, as a PBM, contracts with a network of retail, mail order, and specialty pharmacies to build "pharmacy networks" that can provide and dispense prescription medication services to patients. In this capacity, Express Scripts dictates the terms and conditions of participation through numerous unilaterally drafted contract documents. Participating pharmacies must accept these terms and conditions (without any opportunity to negotiate) to participate in Express Scripts' networks, otherwise they would not be reimbursed for the medications dispensed to their patients who also have Express Scripts as their PBM.

---

[5] Drug Channels, DCI's Top 15 Specialty Pharmacies of 2021—And Three Factors that Will Reshape 2022, March 8, 2022, https://www.drugchannels.net/2022/05/dcis-top-15-specialty-pharmacies-of.html

23. Life Star has no input or opportunity to negotiate the terms of the contract with Express Scripts. Rather, everything is unilaterally prepared by Express Scripts. Said another way, the contractual relationship between Life Star and Express Scripts is accurately and appropriately characterized as the quintessential adhesion contractual relationship.

24. But ultimately, due to the significant implications of contracting (or not contracting) with Express Scripts (and other large PBMs), independent providers like Life Star must contract with Express Scripts so they can dispense medications for their patients that have Express Scripts as their PBM, including those within the Medicare Part D Program.

25. In addition to the Contract documents specified above, the 2022 Provider Manual expressly incorporates federal law at § 7.1 by citing to 42 CFR § 423.505(i). 42 CFR § 423.505(i) requires, among other things, "[e]ach and every contract governing Part D sponsors and first tier, downstream, and related entities, must contain the following… (iii) A provision requiring that any services or other activity performed by a first tier, downstream, and related entity in accordance with a contract are consistent and comply with the Part D sponsor's contractual obligations; (iv) Each and every contract must specify that first tier, downstream, and related entities must comply with all applicable Federal laws, regulations, and CMS instructions."

26. 42 CFR § 423.501 defines "First Tier Entity" as "any party that enters into a written arrangement, acceptable to CMS, with a Part D plan sponsor or application to provide administrative services or healthcare services for a Medicare eligible individual under Part D." Thus, Express Scripts is a First Tier Entity and must comply with all applicable federal laws, regulations, and CMS instructions in its relationship with pharmacies like Life Star.

27. Among the federal laws that Express Scripts has incorporated by reference into its Contract with Life Star is the federal "Any Willing Provider law" ("AWPL"), codified in the Social

Security Act at 42 U.S.C. §1395w-104(b)(1)(A). The AWPL applies directly to Medicare programs, and requires a prescription drug plan to permit the participation of any pharmacy that meets the terms and conditions of participation under the plan. Life Star meets the reasonable and relevant terms and conditions of participation in Express Scripts' network(s).

28. The AWPL is further codified at 42 C.F.R. §423.505(b)(18), which states that a Part D plan sponsor, and all related first tier and downstream entities such as PBMs, must agree to have "a standard contract with reasonable and relevant terms and conditions of participation whereby any willing pharmacy may access the standard contract and participate as a network pharmacy." Again, Life Star meets the reasonable and relevant terms and conditions of participation in Express Scripts' network(s).

**IV. Audit of Life Star Pharmacy**

29. On or about March 23, 2022, Life Star was notified that Express Scripts was conducting an audit of thousands of prescriptions filled and dispensed by Life Star over a substantial period of time of nearly 1.5 years, between November 16, 2020 and March 8, 2022.

30. Express Scripts requested a summary of all purchases, returns, and credits, photocopies of certain prescriptions identified by Express Scripts, prescriber information, proof of copayment, and signature/shipping log entries. Life Star cooperated with these requests and provided the documents Express Scripts requested.

31. Later, on June 17, 2022, Life Star received Initial Audit Results detailing the results of Express Scripts' audit. The Initial Audit Results alleged $41,318.48 in alleged discrepancies. On July 1, 2022, Life Star timely appealed Express Scripts Initial Audit Results. In its appeal, Life Star provided comprehensive documentation disputing and refuting Express Scripts' alleged audit discrepancies. This documentation included wholesaler purchasing records, patient attestations,

sales receipts related to copayments, and delivery confirmation sheets. Again, this information refuted Express Scripts' alleged discrepancies and Express Scripts <u>should</u> have entirely reversed its alleged discrepancies—but it did not.

32. Instead, on July 18, 2022, Express Scripts issued its Final Audit Results which significantly reduced the amount allegedly discrepant from $41,318,48 down to $13,273.84. However, Express Scripts still alleged that Life Star did not provide sufficient proof of copay collections for an amount of less than $30.00 corresponding to just 11 claims during the 16-month period of investigation. Despite receiving patient attestations and other documentation, Express Scripts insisted that certain claims remained discrepant.

33. But Life Star provided documentation for each of the 11 allegedly discrepant claims, documentation which fully resolved any allegation that Life Star did not collect the less than $30.00 in copayments from these 11 patients. Further, once it became clear that Express Scripts determined that it would not accept certain conclusive documentation submitted on July 1, 2022, Life Star provided an additional comprehensive explanation of its efforts to collect these copayments from patients.

34. In one such instance, Life Star identified a $315.00 copayment that it collected from its patient. However, Express Scripts alleged that Life Star did not collect an additional **<u>$0.58</u>** in copayment, and thus sought to recoup the **<u>entire</u>** claim worth approximately $1,262.33. Notably, the patient was contacted and was subsequently charged the remaining $0.58, constituting full collection of the copayment. Thus, this alleged discrepancy was fully resolved.

35. In total, the amount of uncollected copayments **<u>alleged</u>** by Express Scripts was **<u>$29.23</u>**. Despite assurances that there were no discrepancies or other unresolved issues, Express Scripts recouped **<u>$11,756.24</u>** for each allegedly discrepant claim, and took the drastic and

draconian step of terminating Life Star from its pharmacy networks—this conduct under the facts and circumstances is wholly unreasonable and defies all notions of reasonableness and good faith.

36. Further, Express Scripts, on behalf of Prime Therapeutics, alleged that Life Star did not provide sufficient purchase records to establish that it maintained sufficient product inventory to support the medications it dispensed and billed. In response, Express Scripts sought to recoup $1,517.60. Life Star refuted this allegation by once again providing additional documentation. Nevertheless, Express Scripts recouped the amount entirely and terminated Life Star from its networks, which is unreasonable and constitutes bad faith on Express Scripts' part.

37. In response to Express Scripts July 18, 2022 Final Audit Results, on August 2, 2022, Life Star submitted additional correspondence further disputing the allegedly discrepant claims to Express Scripts and articulated its staunch disagreement with Express Scripts' handling of the matter.

38. On August 4, 2022, Express Scripts responded by notifying Life Star that it would be terminated from the Express Scripts pharmacy networks effective August 19, 2022.

39. By letter dated August 17, 2022, Life Star further disputed Express Scripts findings and termination. However, Express Scripts acted in bad faith and unreasonably by refusing to consider Life Star's submissions and opted to terminate Life Star on August 19, 2022.

40. In total, Express Scripts alleged 12 discrepancies resulting in $13,273.84 being recouped without a sufficient contractual or legal basis and Express Scripts terminating Life Star.

41. Express Scripts recoupment of $13,273.84 in reimbursement and subsequent termination after Life Star refuted the alleged discrepancies for what amounted to less than $30.00 in alleged copay collection deficiencies constitutes a breach of contract as well as unreasonable, bad faith conduct depriving Life Star of its reasonable expectations under the Parties' contract.

42. Further, Express Scripts refusal to accept Life Star's documentation, and its subsequent decision to terminate Life Star due to alleged audit discrepancies which have been refuted constitutes an improper termination of Life Star by Express Scripts.

## COUNT ONE
## BREACH OF CONTRACT

43. Life Star repeats and reiterates each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

44. Life Star and Express Scripts have entered into a written contract which is comprised of the pharmacy provider agreement and provider manual along with its amendments.

45. Express Scripts issued a termination letter to Life Star terminating Life Star "for cause" based on allegations of discrepancies worth less than $30.00.

46. Life Star provided documentation refuting Express Scripts' allegations of audit discrepancies, however, Express Scripts has not rescinded its termination of Life Star.

47. Because Life Star refuted the alleged discrepancies, Express Scripts does not have sufficient cause to terminate Life Star from the Express Scripts networks.

48. Even if Express Scripts allegations against Life Star are accepted as true, the allegations at worst are breaches that are not material such that Express Scripts is justified in ending the entire contractual relationship and terminating Life Star from its pharmacy networks – this notion is well established under Missouri law.

49. Additionally, Life Star took action to provide documentation to Express Scripts that refuted Express Scripts allegations, thus curing any alleged breach of the parties' agreement.

50. However, by terminating Life Star under the circumstances and without sufficient cause based on inaccurate allegations of wrongdoing, Express Scripts has breached its contract with Life Star by violating the pharmacy provider agreement and provider manual.

51. As a proximate and direct result of Express Scripts' violations, Life Star has been and will continue to be damaged.

## COUNT TWO
## BREACH OF CONTRACT

52. Life Star repeats and reiterates each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

53. The terms of the parties' Contract require Life Star to provide services, including the dispensing of covered medications to eligible beneficiaries in the Express Scripts Network.

54. Further, Section 3.1(a) of the Provider Agreement states that "[f]or services performed in accordance with the terms and conditions of this Agreement, Express Scripts shall pay Provider the rates as set forth in the applicable rate sheet(s)."

55. Thus, the terms of the parties' Contract requires that Express Scripts reimburse Life Star for its dispensing of covered medications to Express Scripts beneficiaries.

56. Accordingly, when Life Star dispensed covered medications and submitted claims for reimbursement to Express Scripts in accordance with the Contract, Express Scripts was required to provide reimbursement to Life Star.

57. Thus, when Express Scripts subsequently recouped $13,273.84 in claims without any credible reason, it breached the contract between the parties.

58. As a direct and proximate result of Express Scripts' conduct and breach, Life Star has and continues to suffer damages.

## COUNT THREE
## BREACH OF CONTRACT

59. Life Star repeats and reiterates each and every allegation set forth in the prior paragraphs of this Complaint as if set forth at length herein.

60. The Parties' have a written Contract that consists of the Provider Agreement, Provider Manual, various Network Updates, addenda, and correspondence.

61. The Provider Manual cites to 42 CFR § 423.505(i) and requires Express Scripts to comply with all federal laws and regulations.

62. 42 CFR § 423.505(i) requires, among other things, "[e]ach and every contract governing Part D sponsors and first tier, downstream, and related entities, must contain the following… (iii) A provision requiring that any services or other activity performed by a first tier, downstream, and related entity in accordance with a contract are consistent and comply with the Part D sponsor's contractual obligations; (iv) Each and every contract must specify that first tier, downstream, and related entities must comply with all applicable Federal laws, regulations, and CMS instructions."

63. 42 CFR § 423.501 defines "First Tier Entity" as "any party that enters into a written arrangement, acceptable to CMS, with a Part D plan sponsor or application to provide administrative services or healthcare services for a Medicare eligible individual under Part D." Thus, Express Scripts constitutes a First Tier Entity and must comply with all applicable federal laws, regulations, and CMS instructions.

64. The applicable federal laws include 42 U.S.C. §1395w-104(b)(1)(A), the "Any Willing Provider" Law ("AWPL"). The AWPL applies directly to Medicare programs and requires a prescription drug plan or its contracted pharmacy benefit manager to permit the participation of any pharmacy that meets the terms and conditions of participation under the plan.

65. The AWPL is further codified in 42 C.F.R. §423.505(b)(18), which states that a Part D plan sponsor, and all related downstream entities such as PBMs, must agree to have "a standard contract with reasonable and relevant terms and conditions of participation whereby any

willing pharmacy may access the standard contract and participate as a network pharmacy."

66. Thus, when Life Star accepted and complied with Express Scripts' standard terms and conditions, Express Scripts was bound by the Contract and AWPL. Express Scripts violated the AWPL when it terminated Life Star without cause from its Pharmacy Network.

67. As a direct and proximate result of Express Scripts' conduct and contract breaches, Life Star has suffered and continues to suffer substantial monetary damages by being unable to dispense prescription claims to Express Scripts beneficiaries.

## COUNT FOUR
## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

68. Life Star repeats and realleges each of the allegations set forth in the paragraphs above as if fully set forth at length herein.

69. Missouri law implies a covenant of good faith and fair dealing into every contract.

70. The Parties' contract in this case is governed by Missouri law and thus implies a covenant of good faith and fair dealing which requires each Party to carry out their obligations under the contract in good faith.

71. A party can breach the covenant of good faith and fair dealing in various ways including by exercising judgment and/or discretion conferred under the terms of the parties' contract or agreement in a manner that evades or defies the spirit of the parties' agreement and denies or otherwise deprives a party of the expected benefits of the agreement.

72. Express Scripts exercised judgment under the terms of the parties' agreement in a manner that defied the spirit of the Parties agreement and/or contract including by receiving and reviewing Life Star's audit appeal documents, but subsequently and inexplicably rejecting the proofs provided during Life Star's appeal and subsequently terminating the parties' contractual relationship with no credible reason or concern.

73. Express Scripts' review and rejection of Life Star's appeal documents was done in bad faith because there was no justifiable reason not to consider or otherwise accept the documents and information. Thus, Express Scripts' conduct deprived Life Star of the benefit of its bargain.

74. Express Scripts' conduct also fully defied Life Star's reasonable expectations under the parties' contract and/or agreement that any documents submitted during the audit dispute process would be reviewed in good faith in light of all available information.

75. As a direct and proximate result of Express Scripts' improper conduct and breaches and violations of the covenant of good faith and fair dealing, Life Star has been caused to sustain substantial damages and continues to sustain substantial damages.

## COUNT FIVE
## BREACH OF NEW YORK PUBLIC HEALTH LAW ("PHL") § 280-A

76. Life Star repeats and reiterates the allegations set forth above as if set forth at length herein.

77. Express Scripts, by virtue of conducting business within the State of New York, is subject to PHL § 280-A, which imposes "a duty of good faith and fair dealing with all parties, including but not limited to covered individuals and **pharmacies**, with whom it interacts in the performance of pharmacy benefit management services." (emphasis added).

78. Express Scripts exercised judgment under the terms of the parties' agreement in a bad faith manner by receiving and reviewing Life Star's audit appeal documents, but subsequently and inexplicably rejecting the proofs provided during Life Star's appeal and subsequently terminating the parties' contractual relationship with no credible reason or concern.

79. Express Scripts' review and rejection of Life Star's appeal documents was done in bad faith because it presumed that the documents submitted by Life Star were not authentic despite the totality of the circumstances and evidence to the contrary.

16

80. Thus, Express Scripts' rejection constitutes a violation of the duty of good faith and fair dealing in its interaction with Life Star concerning the performance of pharmacy benefit management services. Express Scripts purposely and knowingly interpreted the contract in a bad faith manner with a bad faith motive to terminate the Parties' contract, thus violating Express Script's independent statutory obligation to deal in good faith with contracting parties.

81. As a direct and proximate result of Express Script's actions, Life Star has been proximately caused to sustain substantial damages.

**WHEREFORE,** Plaintiff Life Star Pharmacy, Inc. d/b/a Life Star Pharmacy, respectfully prays that this Honorable Court enter judgment in its favor and against Defendant Express Scripts, Inc. as follows:

(a) Issuing a declaration that Express Scripts' termination of Life Star was improper and must be reversed;

(b) Awarding Plaintiff any and all amounts that were erroneously recouped and withheld from Plaintiff pursuant to Express Scripts' improper audit;

(c) Permanent injunctive relief directing Defendant to reinstate Plaintiff into its pharmacy networks as a result of Express Scripts' improper termination;

(d) Awarding Plaintiff compensatory and/or consequential damages, including lost profits or savings, injury to reputation, loss of customers and/or business resulting from Express Scripts' improper termination in an amount to be determined at trial;

(e) Awarding Plaintiff interest, attorney's fees, and costs incurred herein;

(f) Awarding Plaintiff such other relief as this Court deems just and proper under the circumstances.

**JURY DEMAND**

Pursuant to RULE 38(b) of the FEDERAL RULES OF CIVIL PROCEDURE, Life Star demands a trial by jury as to all claims and all issues properly so triable.

Respectfully submitted,

**FRIER LEVITT, LLC**

By: /s/ Lucas W. Morgan
Jonathan E. Levitt, Esq. (Bar No. 65680)
Todd Mizeski, Esq. (Bar No. 25122001N)
Lucas W. Morgan, Esq. (Bar No. 120222014N)
84 Bloomfield Avenue
Pine Brook, NJ 07058
Telephone: (973) 618-1660
Facsimile: (973) 618-0650
Attorneys for the Plaintiff